UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**JURY TRIAL DEMANDED**

Case No.:

MICHAEL MEYER,

      Plaintiff,

v.

CARNIVAL CORPORATION,
 a Panama corporation, d/b/a
CARNIVAL CRUISE LINES;
COX & COMPANY, LTD.,
a St. Lucia entity; SAILAWAY
TOURS, a St. Lucia entity, and
SEASPRAY CRUISES, LTD., a
St. Lucia entity,

      Defendants.

_____/

**COMPLAINT**

COMES NOW the Plaintiff, MICHAEL MEYER, and sues the defendants, CARNIVAL

CORPORATION, a Panama corporation, d/b/a CARNIVAL CRUISE LINES; COX &

COMPANY, LTD., a St. Lucia entity; SAILAWAY TOURS, a St. Lucia entity; and

SEASPRAY CRUISES, LTD., a St. Lucia entity; and further alleges:

**THE PARTIES**

    1.    Plaintiff, MICHAEL MEYER [hereinafter "MEYER" or "plaintiff"], at all

relevant times, is a United States citizen and resident and domiciliary of the State of Arizona.

    2.    Defendant CARNIVAL, at all material times, was and is a Panama company

which maintains its principal place of business in Miami-Dade, Florida.

3.     Defendant CARNIVAL, at all relevant times, is a cruise line common carrier of passengers which owns and/or operates a fleet of cruise ships, including the *M/V CARNIVAL VICTORY*.

4.     Defendants, COX & COMPANY, LTD. [hereinafter "COX"], SAILAWAY TOURS [hereinafter "SAILAWAY"] and SEASPRAY CRUISES, LTD. [hereinafter "SEASPRAY"], at all material times, are St. Lucia entities.

5.     Defendants COX/SAILAWAY/SEASPRAY, at all relevant times, are marine common carriers of passengers, who own and/or operate and/or charter the *M/V Tango Too,* an 80-foot, 150 passenger, diesel-powered catamaran [hereinafter also "the subject vessel"].

## SUBJECT MATTER JURISDICTION

6.     This is an action for damages for serious personal injuries to MICHAEL MEYER which occurred on March 10, 2011, when he was a ticketed cruise passenger of the *M/V CARNIVAL VICTORY* on a cruise [hereinafter "the subject cruise"] and while plaintiff was a passenger of the *M/V Tango Too*, engaged in a cruise-related excursion called the "Catamaran Cruise to the Pitons" [hereinafter "the subject excursion"] on navigable waters of the Caribbean Sea, along the west coast of the Windward Island of St. Lucia.

7.     The amount in controversy exceeds Two Hundred Fifty Thousand Dollars ($250,000.00).

8.     The plaintiff's separate tickets for both the cruise and the subject excursion were maritime contracts sold to him from Florida by Florida-based defendant CARNIVAL CORPORATION, a Panama corporation, d/b/a CARNIVAL CRUISE LINES [hereafter "CARNIVAL"].

9.      Subject matter jurisdiction of this cause is further founded upon the Court's general maritime jurisdiction pursuant to *28 U.S.C. §1333*; and/or upon the Court's supplemental jurisdiction, *28 U.S.C.§1367;* and/or upon the Extension of Admiralty Jurisdiction Act, *46 U.S.C.§30101;* and/or upon the Court's diversity jurisdiction, *28 U.S.C. §1332.*

## PERSONAL JURISDICTION OVER THE DEFENDANTS

10.     Defendant CARNIVAL, at all material times, has contractually submitted itself to this court's personal jurisdiction (CARNIVAL has a Southern District of Florida forum clause in its cruise ticket).

11.     This lawsuit alleges, *inter alia,* that the plaintiff suffered severe personal injuries as a consequence of joint and several fault by CARNIVAL, and/or COX, and/or SAILAWAY, and/or SEASPRAY regarding the subject excursion; and further alleges that each defendant is legally responsible for the other's relevant fault, due to the existence of alleged classic agency relationships among the defendants.

12.     Under the facts alleged throughout this complaint (resolving all reasonable inferences in plaintiff's favor, as required at this stage), personal jurisdiction over defendants COX, and SAILAWAY and SEASPRAY exists under the following long-arm provisions:

A.  *§48.193(2), F.S.* (general jurisdiction); and/or,

B.  *§48.193(1)(a), F.S.* (specific jurisdiction for conducting a "business venture" or "business" in Florida); and/or,

C.  *§48.193(1)(b), F.S.* (specific jurisdiction-committing a tort in Florida); and/or,

D.  *§§685.101-.102, F.S.* (specific jurisdiction for entering into an operating agreement containing a Florida forum clause); and/or,

E.  *Rule 4 (k)(2), Fed. Rules Civ Procedure* (alternative federal jurisdiction).

## VENUE

13.     Defendant CARNIVAL sold a cruise ticket to the plaintiff in and from Florida for the subject cruise which, upon information and belief, stated:

> It is agreed by and between the Guest and Carnival that *all disputes and matters arising under, or in connection with or incident to this Contract or the Guest's cruise*, including travel to and from the vessel, shall be litigated, if at all, before the United States District Court for the Southern District of Florida in Miami, or as to those lawsuits to which the Federal Courts of the United States lack subject matter jurisdiction, before a court located in Miami-Dade County, Florida, U.S.A., to the exclusion of the Courts of any other county, state or country. (emphasis added)

The original of the plaintiff's cruise ticket is believed to be in the possession of defendant CARNIVAL, and will be requested in discovery.

14.     The plaintiff's injuries and claims, at all relevant times and as more fully set forth below, are connected to and/or incident to and/or arose from and/or were in the course of both the subject cruise and the subject cruise-related excursion.

15.     The venue provision in the plaintiff's cruise ticket (quoted *verbatim* in ¶13, *supra*) literally requires the plaintiff to initiate his claim(s) against CARNIVAL *and* COX, *and* SAILAWAY *and* SEASPRAY only in this Florida federal court.

16.     Additionally, COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, were parties to a separate written and/or oral operating agreement with CARNIVAL, to co-venture the "Catamaran Cruise to the Pitons" exclusively for the benefit of CARNIVAL's cruise passengers.  The original of this operating agreement is believed to be in the possession of the defendants, and will be requested in discovery.

17.     The operating agreement in question was solicited, negotiated and formed by defendants COX, and/or SAILAWAY and/or SEASPRAY with CARNIVAL in the State of Florida, and contains Florida forum, choice of law, insurance and indemnity provisions.

4

18.     CARNIVAL's operating agreement with COX and SAILAWAY and SEASPRAY related to an obligation or obligations arising out of a transaction in the aggregate not less that $250,000, and was otherwise freely negotiated and not unreasonable or unjust.

19.     The operating agreement in question contains a Florida forum clause which states: *"Operator* **[meaning COX, and/or SAILAWAY and/or SEASPRAY]** *consents to the personal jurisdiction of the courts serving the Southern District of Florida in the event of any lawsuits to which Carnival is a party and which is related to, in connection with, arising from, or involving the shore excursion or the terms of this agreement,"* or other words to that same effect.  (emphasis added)

## GENERAL ALLEGATIONS

20.     The plaintiff MICHAEL MEYER, at the time and place of his injuries on March 10, 2011 and at all other relevant times, was a fare-paying cruise passenger in the course and scope of a cruise of the *M/V CARNIVAL VICTORY*.

21.     Plaintiff's relevant cruise ticket contract of carriage with CARNIVAL was formed and executed in the State of Florida.

22.     The cruise in question was a "U.S.-touching" voyage subject to *46 U.S.C.§30509*, which generally prohibits owners, operators, and managers of passenger vessels *and their agents* from inserting provisions in a maritime contract purporting to limit "the liability of the owner, master, manager *or agent*" to a passenger "for personal injury or death caused by the negligence or fault of the owner or the owner's employees *or agents*." (emphasis added)

23.     CARNIVAL's marine operations, at all relevant times, included a "shore excursion program," which was operated by defendant CARNIVAL from Miami, Florida.

24.     CARNIVAL's shore excursion program offers tours in the various ports of call for sale to passengers.  These tours focus on the highlights of the destinations of defendant CARNIVAL's vessels; and they are the *sine qua non* of any cruise for most passengers.

25.     CARNIVAL's shore excursion program, upon information and belief, is defendant CARNIVAL's leading source of on-board revenue, ahead of gambling and beverage sales, and generates hundreds of millions of dollars in annual revenue to CARNIVAL.

26.     Most of CARNIVAL's port calls in the Caribbean are to economically depressed countries whose economies rely upon tourism and are highly dependent upon revenue derived from the North American cruise industry and its mostly U.S. passengers (approximately 20% of all U.S. cruise passengers reside in Florida).  As a result, cruise carriers such as CARNIVAL have an enormous amount of leverage and control over individual local tour and excursion operators, to impose conditions and terms of behavior favorable to the carrier and/or to its passengers.

27.     Procurement of local excursions by CARNIVAL's shore excursion program is handled by CARNIVAL officials working from Miami, Florida.

28.     CARNIVAL's excursion officials from Florida, at all relevant times, visit potential ports of call to determine if there are a sufficient number of local attractions to support shore excursion sales by CARNIVAL aboard its vessels; and the existence or non-existence of such attractions forms part of the basis of CARNIVAL's decision to include (or not to include) a given port in its vessels' itineraries.

29.     Prior to 2011, COX, and/or SAILAWAY and/or SEASPRAY, upon information and belief, came to Florida to solicit, negotiate, form, and maintain a continuous, systematic and

long-term excursion business enterprise with CARNIVAL, to provide the so-called "Catamaran Cruise to the Pitons" excursion (and other excursions) to CARNIVAL's passengers.

30.      In doing so, COX, and/or SAILAWAY and/or SEASPRAY made a deliberate decision <u>not</u> to restrict the totality of their business operations (which include marketing, advertising, sales, and revenue management) to St. Lucia.

31.      Instead, COX, and/or SAILAWAY and/or SEASPRAY, at all relevant times, deliberately chose to extend their advertising, marketing, and sales to CARNIVAL's non-St. Lucia customer base (mostly in the U.S., with Florida being the source of 20% of U.S. cruise passengers).

32.      COX, and/or SAILAWAY and/or SEASPRAY, upon information and belief, came to Florida to solicit CARNIVAL's excursion business (and that of the other major Florida-based cruise lines, e.g. Royal Caribbean and Norwegian) and entered into and maintained a Florida-centric operating agreement(s) with CARNIVAL (and with the other major Florida-based cruise lines) which contained Florida forum, choice of law, insurance, and indemnity obligations applicable to COX, and/or SAILAWAY and/or SEASPRAY.

33.      CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, looked upon themselves as partners or co-venturers in providing the "Catamaran Cruise to the Pitons" (and other excursions) to CARNIVAL's passengers.

34.      At all relevant times, under COX's and/or SAILAWAY's and/or SEASPRAY's arrangement with CARNIVAL, the latter would and did handle all advertising, marketing, bookings, and sales to CARNIVAL's customer base (mostly in the U.S., with Florida providing 20% of all U.S. passengers).

35.     CARNIVAL, upon information and belief and at all relevant times, acted in and from Florida as exclusive marketing and sales "agent" of COX and/or SAILAWAY and/or SEASPRAY, with COX's and/or SAILAWAY's and/or SEASPRAY's complete authority to bind COX and/or SAILAWAY and/or SEASPRAY to perform excursion ticket contracts with CARNIVAL's non-St. Lucia (mostly U.S.) customers, without first checking with COX/SAILAWAY/SEASPRAY.

36.     CARNIVAL would and did print and provide the excursion tickets (which were all-inclusive and had CARNIVAL's logo on them), and CARNIVAL allowed booked passengers to charge the excursion tickets to their customer accounts with CARNIVAL.

37.     CARNIVAL would and did transport the excursion customers (*i.e.,* CARNIVAL passengers) from Florida to the port of Castries in St. Lucia, and then would off-load the customers from the CARNIVAL ship(s) onto the dock, and transfer them to the *M/V Tango Too.*

38.     CARNIVAL would and did collect the entire gross proceeds from the "Catamaran Cruise to the Pitons," (and other excursions offered by COX and/or SAILAWAY and/or SEASPRAY to CARNIVAL's passengers).

39.     CARNIVAL, upon information and belief, would and did bank the entire proceeds in a Miami bank account; and thereafter CARNIVAL would and did wire COX's and/or SAILAWAY's and/or SEASPRAY's share of the proceeds to St. Lucia.

40.     CARNIVAL, at all relevant times and upon information and belief, divided the proceeds almost evenly with COX and/or SAILAWAY and/or SEASPRAY.

41.     The operating agreement and/or relationship between CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY regarding the "Catamaran Cruise to the Pitons," at all relevant times and upon information and belief:

A.     Limited the excursion covered by the agreement to CARNIVAL passengers; and,

B.     Granted CARNIVAL an exclusive agency to market and sell "all-inclusive" tickets for the subject shore excursion in and/or from Florida to passengers of CARNIVAL in a way which would bind COX and/or SAILAWAY and/or SEASPRAY to the obligation to perform the excursion without the need for CARNIVAL to confirm a reservation in advance with COX and/or SAILAWAY and/or SEASPRAY; and,

C.     Allowed CARNIVAL to control the number of tickets sold for any given excursion, and thereby dictate to COX and/or SAILAWAY and/or SEASPRAY the number of customers COX and/or SAILAWAY and/or SEASPRAY would have to find a way to accommodate  on each individual excursion; and,

D.     Required COX and/or SAILAWAY and/or SEASPRAY to write and submit a "detailed" description of the excursion to CARNIVAL, which CARNIVAL would then communicate in Florida and elsewhere to potential and booked passengers for CARNIVAL cruises; and,

E.     Required COX and/or SAILAWAY and/or SEASPRAY to refuse direct requests for tickets to COX and/or SAILAWAY and/or SEASPRAY by

CARNIVAL passengers and to refer all such inquiries to CARNIVAL; and

F.    Allowed CARNIVAL the absolute and sole discretion to set the gross price for any and all excursion tickets sold to CARNIVAL passengers; and,

G.    Allowed CARNIVAL to collect and retain the gross proceeds of all ticket sales to CARNIVAL passengers; and,

H.    Allowed CARNIVAL to deposit all of the gross proceeds into a bank in Miami, wiring COX's and/or SAILAWAY's and/or SEASPRAY's share to them after the end of the cruise; and,

I.    Allowed CARNIVAL, in its sole discretion, to determine refunds, if any, to CARNIVAL passengers; and,

J.    Expressly required COX and/or SAILAWAY and/or SEASPRAY "to exercise reasonable care for the safety of CARNIVAL passengers" who participated in the subject excursion; and expressly provided that COX and/or SAILAWAY and/or SEASPRAY, and their agents and employees, would be "fully liable" for their failures, if any, to do so; and,

K.    Required COX and/or SAILAWAY and/or SEASPRAY "to satisfy the highest standards of quality in the industry," or words to that effect; and,

L.    Required COX's and/or SAILAWAY's and/or SEASPRAY's employees to act in a professional manner consistent with generally accepted industry standards; and,

M.      Expressly provided that the business arrangement between CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY and the latter's performance would be governed by United States maritime and Florida law; and,

N.      Required COX and/or SAILAWAY and/or SEASPRAY to procure insurance for the excursion for both CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY with both a U.S. "suit" definition and a U.S. jurisdiction rider; and,

O.      Expressly required COX and/or SAILAWAY and/or SEASPRAY to consent to personal jurisdiction by a Florida court for customer litigation against CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY in Florida arising from the excursion; and,

P.      Required COX and/or SAILAWAY and/or SEASPRAY to indemnify and defend CARNIVAL in <u>Florida</u> against <u>all excursion-related lawsuits filed in Florida</u> (where CARNIVAL requires passengers to file such suits).

42.      COX and/or SAILAWAY and/or SEASPRAY, upon information and belief, at all material times, came to Florida, either in person or via agents, to procure the necessary *and indispensable* U.S. insurance to cover themselves and CARNIVAL against any excursion-related claims filed in this Florida court by injured CARNIVAL passengers.

43.      Upon further information and belief, COX and/or SAILAWAY and/or SEASPRAY, either directly or through agents in Florida, set up loans and accounts at Florida banks to procure and service the liability insurance which was indispensable to being able to maintain an excursion enterprise with Florida-based CARNIVAL.

11

44.    COX and/or SAILAWAY and/or SEASPRAY, upon information and belief, began defending CARNIVAL in this Florida lawsuit, *i.e.,* began performing its indemnity obligations here, even before COX and/or SAILAWAY and/or SEASPRAY were themselves served with this complaint.

45.    Plaintiff MICHAEL MEYER and all other fare-paying CARNIVAL passengers, at all relevant times, were obvious, intended beneficiaries-in-fact of the aforementioned provisions of the agreement between CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, especially the portions whereby COX and/or SAILAWAY and/or SEASPRAY assumed duties expressly and directly benefitting CARNIVAL passengers (including express duties of care) and/or COX's and/or SAILAWAY's and/or SEASPRAY's agreement to accede to jurisdiction of a Florida court in the event of a passenger lawsuit here, and/or COX's and/or SAILAWAY's and/or SEASPRAY's agreement to indemnify CARNIVAL in Florida against an excursion-related cause of action here by an injured passenger.

46.    There is a direct affiliation, and/or nexus and/or substantial connection, between the plaintiff's causes of action alleged in this complaint against COX and/or SAILAWAY and/or SEASPRAY and their continuous and systematic business activity in this state (as alleged throughout this complaint), which was such that these defendants should reasonably have anticipated being haled into court in Florida for an excursion-related injury like this plaintiff's.

47.    CARNIVAL's onboard cruise directors and shipboard Shore Excursion Manager(s), and other CARNIVAL media, at all relevant times, frequently allude to tours and excursions sold by CARNIVAL as "our" tours, or words to that effect.

48.    CARNIVAL's on-board cruise staff and other CARNIVAL media, at all relevant times, exhort passengers to purchase tickets well in advance of the relevant port calls before they are "sold out."

49.    CARNIVAL, at all relevant times, deliberately directs words and actions toward its passengers calculated to imply that CARNIVAL-sponsored tours and excursions are the only real game in town in the various ports of call and that there are no comparable tours available locally in the ports of call from true independent operators not affiliated with CARNIVAL.

50.    CARNIVAL's cruise staff, upon further information and belief and at all relevant times, also warn CARNIVAL passengers to beware of independent operators selling similar tours and excursions off the ship.

51.    CARNIVAL's onboard cruise staff, and CARNIVAL's Florida-based website and CARNIVAL's other media, also advise CARNIVAL's passengers who are contemplating tours and excursions during port calls that CARNIVAL vessel's will wait for tours and excursions purchased directly from CARNIVAL; but will not wait for passengers purchasing tours from independent operators off the ship.

52.    CARNIVAL, upon information and belief and at all material times in furtherance of its business arrangement with COX and/or SAILAWAY and/or SEASPRAY, deliberately engaged in such aggressive marketing techniques both in Florida and onboard the *M/V CARNIVAL VICTORY,* to identify CARNIVAL in its passengers' minds with the tours and excursions sold by CARNIVAL, including the subject excursion.

53.    Upon information and belief, CARNIVAL engaged and engages in this behavior, in whole or in part, to water down or to negate, in the minds of its passengers, certain other self-

serving, false and fraudulent written disclaimers, buried by CARNIVAL in fine print, that excursions are operated by so-called "independent contractors."

54.     CARNIVAL, under its relationship with COX and/or SAILAWAY and/or SEASPRAY, could literally unilaterally dictate, and did dictate, the number of its passengers which COX and/or SAILAWAY and/or SEASPRAY would have to find a way to accommodate on each excursion when a CARNIVAL vessel arrived in St. Lucia.

55.     CARNIVAL, acting in Florida as agent of COX and/or SAILAWAY and/or SEASPRAY, booked the plaintiff into the subject "Catamaran Cruise to the Pitons" excursion, to take place when the *M/V CARNIVAL VICTORY* made port in Castries, St. Lucia on March 10, 2011.

56.     CARNIVAL, through its website in Florida and/or aboard the *M/V CARNIVAL VICTORY* sold at least 80 tickets for the subject excursion which was to occur on March 10, 2011.

57.     The excursion tickets in question were classic maritime contracts of adhesion, constructed and printed entirely by CARNIVAL, acting in and from Florida as marketing and sales agent of COX and/or SAILAWAY and/or SEASPRAY, and were imposed upon CARNIVAL passengers without any opportunity for negotiation, and were offered to the plaintiff by CARNIVAL on a take-it-or-leave-it basis.

58.     The ticket for the excursion sold by CARNIVAL to the plaintiff was "all-inclusive," covering for a single gross price every single aspect of the subject excursion, including round-trip transportation between the ship and the catamaran and all equipment.

59.     CARNIVAL, at all material times and upon information and belief, did not disclose in its marketing, booking or sale of the subject shore excursion tickets to the plaintiff

14

that CARNIVAL was acting specifically for defendant COX and/or SAILAWAY and/or SEASPRAY, whose specific identity was never revealed by CARNIVAL to plaintiff before CARNIVAL booked him into the subject excursion.

60.     On March 10, 2011, the *M/V CARNIVAL VICTORY* was moored to a pier in the port of Castries, St. Lucia, and at all relevant times remained in navigable waters.

61.     Upon information and belief, the plaintiff's actual excursion ticket was first communicated and/or delivered to him by CARNIVAL aboard the ship, shortly before the excursion itself, and after the time for cancellation without financial penalty had expired.

62.     CARNIVAL, pursuant to the subject all-inclusive excursion tickets it had issued to the plaintiff and another approximately 80 passengers from the *M/V CARNIVAL VICTORY,* escorted them off the ship, down the pier, and onto the *M/V Tango Too.*

63.     The itinerary for the excursion called for the *M/V Tango Too* to leave Castries harbor and motor south along the west (Caribbean) coast of St. Lucia, for approximately 1 ½ hours to a pair of spectacular, high rock pinnacles known as "The Pitons."

64.     On the way to The Pitons, the *M/V Tango Too* motored into a cove with a secluded beach, and tied off to a mooring, to allow the passengers a swimming opportunity.

65.     At all relevant times, there commonly was a severe and turbulent out-flowing current in this cove. This condition usually required the *M/V Tango Too's* propellers to be kept engaged, to stabilize the vessel at various times during the swimming interlude.

66.     These facts were well-known, or in the exercise of reasonable care should have been known, to defendants CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, none of whom bothered to warn the excursion guests, who instead were encouraged to jump off the vessel into the water upon arrival at the cove.

67.    The 65-year-old plaintiff and other passengers jumped over the side of the *M/V Tango Too* and into the water, following advice to do so from one or more members of the crew. The plaintiff was immediately caught by the strong current, which propelled him toward and into the vessel's turning props, which cut him repeatedly and severely.

68.    As a direct and proximate result of this incident, the plaintiff was severely injured in and about his body and extremities, suffered pain and mental anguish therefrom, loss of capacity for the enjoyment of life, incurred medical expenses in the treatment of the injuries, suffered physical handicap, and his working ability was impaired.  The injuries are either permanent or continuing in nature and the plaintiff will suffer the losses and impairment in the future.

## COUNT I – LIABILITY OF COX AND/OR SAILAWAY AND/OR SEASPRAY FOR NEGLIGENCE/RECKLESSNESS

69.    Plaintiff realleges and incorporates paragraphs 1 through 68 *supra*, 82-97, *infra*, and 108-133, *infra*, as though fully set forth herein.

70.    Defendant COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, had actual and/or constructive knowledge, based upon prior experience and upon knowledge of conditions on the day of plaintiff's injury, that extremely hazardous conditions existed at the location(s) where the passengers were encouraged to swim off the *M/V Tango Too.*

71.    Defendant COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, had actual and/or constructive knowledge, based upon prior experience and upon knowledge of conditions on the day of plaintiff's injury, that the subject "Catamaran Cruise to the Pitons" excursion presented a great danger to the plaintiff.

16

72.    In reality, and at all relevant times, the subject excursion and the circumstances surrounding it were of such a nature that in the ordinary course of events its performance would probably cause death or injury if proper precautions were not taken; and COX and/or SAILAWAY and/or SEASPRAY, at all material times, was aware of that reality.

73.    Defendants COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, functioned as marine common carriers for hire in reference to the subject excursion, which included round-trip water transportation.

74.    Defendants COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, owed the plaintiff the following non-delegable duties:

A.  A duty to exercise a reasonable care for the safety of passengers; and,

B.  A duty to exercise a reasonable care in all affirmative undertakings regarding the subject excursion; and,

C.  An implied contractual duty pursuant to the excursion ticket sold to the plaintiff to transport the passengers safely throughout the excursion to their final destination; and,

D.  A duty pursuant to the written excursion agreement with CARNIVAL and pursuant to the excursion ticket sold to the plaintiff to exercise reasonable care for the safety of CARNIVAL passengers participating in the subject excursion, including the plaintiff; and,

E.  A duty pursuant to the written excursion agreement with CARNIVAL and pursuant to the excursion ticket sold to the plaintiff to satisfy the highest of standards of quality in the industry regarding the subject shore excursion.

75.     Defendants COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, breached their aforementioned, non-delegable duties in at least the following particulars:

A.     By failing to warn of known dangers (*e.g.*, COX and/or SAILAWAY and/or SEASPRAY's knowledge of water conditions near the subject cove and secluded beach, and propeller hazards to swimmers); and,

B.     By misrepresenting and/or and mis-communicating and/or failing to communicate information to prospective and pre-booked excursion customers aboard ship and in Florida, including the plaintiff and/or CARNIVAL itself, certain information material to the subject excursion and to the passengers' safety. The misrepresentations included but were not limited to a description of the excursion described as "detailed" which omitted COX and/or SAILAWAY and/or SEASPRAY's knowledge of the hazards. These misrepresentations in Florida by COX and/or SAILAWAY and/or SEASPRAY resulted in detrimental reliance and a change in legal position by the plaintiff in Florida, *i.e.,* he booked the cruise and excursion in Florida; and,

C.     By failing to prepare and orient the plaintiff and other passengers for the subject excursion; and,

D.     By failing to monitor and/or react to water conditions; and,

E.     By failing to supervise the excursion; and,

F.     By providing poorly-trained and/or inadequate numbers of tour guides; and,

G.     By failing to establish and/or to apply safety procedures; and,

H.   By failing to disengage the vessel's propellers; and,

I.   By allowing passengers into the water while the vessel's props were engaged; and,

J.   By other acts and omissions as yet unknown which may be revealed in discovery.

76.   Defendants COX and/or SAILAWAY and/or SEASPRAY, in the entire context and circumstances of its conduct alleged in this Count, acted willfully and/or wantonly and/or recklessly and evinced a conscious disregard of the rights and safety of others, including the plaintiff.

77.   As a direct and proximate result of this negligence and/or willful and/or wanton and/or reckless conduct and/or conscious disregard by COX and/or SAILAWAY and/or SEASPRAY, the plaintiff has suffered, and will suffer, the elements of damage set forth in Paragraph 68 of this complaint.

78.   At the time of this incident, the place of and the instrumentalities causing the plaintiff's injury was under COX's and/or SAILAWAY's and/or SEASPRAY's control and the injury was such as to not occur in the ordinary occurrence of things if the person in control has exercised ordinary care; and the plaintiff was without fault, permitting the plaintiff herein to rely upon the doctrine of *res ipsa loquitur*.

79.   Defendants COX and/or SAILAWAY and/or SEASPRAY is/are liable for the fault of CARNIVAL hereafter alleged in this complaint because, upon information and belief, CARNIVAL at all relevant times acted within COX's and/or SAILAWAY's and/or SEASPRAY's control or right of control; and/or, in the alternative, CARNIVAL was a joint venturer with COX and/or SAILAWAY and/or SEASPRAY (as more fully alleged in Count

19

IV) and/or each defendant was otherwise acting with the other's knowledge and acquiescence as the other's actual or apparent agent, pursuant to representations by CARNIVAL and/or by COX and/or SAILAWAY and/or SEASPRAY to that effect, which were relied upon by the plaintiff in making the decision to purchase a ticket for the subject excursion.

80.     Further, in the alternative, defendants COX and/or SAILAWAY and/or SEASPRAY is/are also liable for the fault of CARNIVAL hereafter alleged in this complaint because at all relevant times COX and/or SAILAWAY and/or SEASPRAY occupied the status of CARNIVAL's undisclosed principal in CARNIVAL's entire activities concerning the "Catamaran Cruise to the Pitons" excursion, including, but not limited to CARNIVAL's marketing and sale of tickets for the subject excursion.

WHEREFORE, the plaintiff respectfully prays for all legally allowable compensatory and punitive damages, costs, and interest (including pre-judgment interest) against the defendants COX and/or SAILAWAY and/or SEASPRAY, and demands trial by jury as to all matters triable as of right by a jury; or, in the alternative, plaintiff respectfully requests the court to order a jury trial pursuant to *Rule 39(c) Fed. Rules Civ. Pro.,* as to all matters not triable as of right by a jury.


## COUNT II –LIABILITY OF CARNIVAL FOR NEGLIGENCE/RECKLESSNESS

81.     The plaintiff realleges and incorporates paragraphs 1-80, *supra*, and 107-130, *infra*, as if expressly set forth herein; and further alleges:

82.     Defendant CARNIVAL, at all relevant times was, and functioned as, a common carrier for hire in reference both to the cruise and to the subject all-inclusive "Catamaran Cruise to the Pitons" excursion, which included all relevant round-trip water transportation.

83.     CARNIVAL, upon further information and belief, prior to the subject incident had received several reports and complaints aboard its vessels and/or at its Miami, Florida office, from its own passengers and from other reliable and trustworthy sources, concerning the extreme dangers and treacherous water conditions, near-death experiences of prior participants in the "Catamaran Cruise to the Pitons" and similar excursions by others, and negligence or incompetence of defendant COX and/or SAILAWAY and/or SEASPRAY and/or its employees and agents regarding the excursion, which all were conditions known to CARNIVAL which foreseeably would confront CARNIVAL's passengers on the subject excursion.

84.     Defendant CARNIVAL, at all relevant times and prior to the subject excursion, had actual knowledge that the portion of the gross revenue from the "Catamaran Cruise to the Pitons" being allocated to the operator by CARNIVAL was insufficient to conduct the excursion in accordance with "highest standards in the industry."

85.      Defendant CARNIVAL, upon information and belief, fostered and promoted an environment and culture within its shore excursion program where relevant CARNIVAL employees, and operators for the excursions, at all material times, were reluctant to cancel or restrict pre-booked excursions for CARNIVAL's passengers for any reason, for fear of incurring CARNIVAL's displeasure due to revenue lost to refunds.

86.     Defendant CARNIVAL at all relevant times, knew or should have known, based upon prior experience and knowledge and upon actual or constructive knowledge of water, currents, and other conditions on or before the day of plaintiff's injuries, that the subject excursion presented a great danger to the person of the plaintiff, and to the other CARNIVAL passengers booked into the excursion by CARNIVAL.

87.     The subject excursion and the circumstances surrounding it, at all relevant times, were of such a nature that in the ordinary course of events its performance would probably cause injury if proper precautions were not taken; and CARNIVAL, at all material times, was aware of that reality.

88.     Defendant CARNIVAL, at all relevant times, had a non-delegable duty to exercise reasonable care for its passengers' safety, including that of the plaintiff.  This duty extended, at all relevant times, beyond the point of debarkation and embarkation in ports of call, and included but was not limited to a duty to warn of dangers known to CARNIVAL in places where a passenger is invited to, or may reasonably be expected to visit during such a port call.

89.     Additionally, CARNIVAL, by directly entering into an all-inclusive maritime contract with the plaintiff for the entire excursion, acquired and owed him an implied contractual, non-delegable duty to transport him safely from the beginning to the end of the excursion.

90.     Additionally, CARNIVAL, by undertaking to organize, make arrangements for, book, and carry out the subject excursion for the plaintiff, acted as his agent and thus owed him a non-delegable fiduciary duty to disclose, and/or to warn the plaintiff of, all material facts.

91.     Additionally, defendant CARNIVAL, at all relevant times, affirmatively undertook took to do the following:

    A.  To investigate and evaluate the "Catamaran Cruise to the Pitons" excursion in
        St. Lucia; and,

    B.  To screen and enroll the "Catamaran Cruise to the Pitons" excursion into
        CARNIVAL's shore excursion program; and,

C.  To hire COX and/or SAILAWAY and/or SEASPRAY to carry out the subject excursion; and,

D.  To formulate a contract to govern the parties' duties and responsibilities for the subject excursion; and,

E.  To retain and exercise control over the subject excursion and operator(s); and,

F.  To supervise the subject excursion and operator(s); and,

G.  To set and enforce performance standards for the subject excursion and operator(s); and,

H.  To inspect the performance of the subject excursion and operator(s); and,

I.  To retain the operator(s) of the subject excursion; and,

J.  To monitor relevant weather and water conditions; and,

K.  To solicit and receive from COX and/or SAILAWAY and/or SEASPRAY, and to affirmatively communicate to its passengers, detailed information concerning the "Catamaran Cruise to the Pitons" excursion; and,

L.  To communicate passenger complaints to the operator(s) of excursions; and,

M.  To train and indoctrinate its own shore excursion managers to monitor performance of the subject excursion and operator(s).

92.    Defendant CARNIVAL, at all relevant times, acquired and owed the plaintiff a non-delegable duty to exercise reasonable care in these affirmative undertakings.

93.    Defendant CARNIVAL, at all relevant times, breached the duties set forth in this Count, as follows:

A.    By failing to exercise reasonable care for the safety of the plaintiff and other passengers involved in the subject excursion; and,

B.     By failing to warn of dangers which were known or should have been known to CARNIVAL in places where a passenger is invited to, or may reasonably be expected to visit during such a port call; and,

C.     By failing to adequately research, investigate, inspect and evaluate the suitability of the "Catamaran Cruise to the Pitons" excursion for CARNIVAL passengers; and,

D.     By failing to adequately screen defendant COX and/or SAILAWAY and/or SEASPRAY and their predecessors-in-interest, as participants in CARNIVAL's shore excursion program; and,

E.     By negligently hiring and/or contracting with defendant COX and/or SAILAWAY and/or SEASPRAY to carry out the "Catamaran Cruise to the Pitons" excursion; and,

F.     By negligently contracting with COX and/or SAILAWAY and/or SEASPRAY; and,

G.     By failing to exercise retained control over defendants COX and/or SAILAWAY and/or SEASPRAY's activities concerning the "Catamaran Cruise to the Pitons" excursion; and,

H.     By negligently supervising defendant COX's and/or SAILAWAY's and/or SEASPRAY's activities concerning the "Catamaran Cruise to the Pitons" excursion; and,

I.     By failing to establish and/or to enforce standards for defendant COX and/or SAILAWAY and/or SEASPRAY's activities and performance concerning the "Catamaran Cruise to the Pitons" excursion; and,

J.      By failing to properly inspect defendant COX and/or SAILAWAY and/or SEASPRAY's performance concerning the "Catamaran Cruise to the Pitons" excursion; and,

K.      By negligently retaining defendant COX and/or SAILAWAY and/or SEASPRAY concerning the "Catamaran Cruise to the Pitons" excursion; and,

L.      By negligently selling, soliciting, marketing, advertising, offering and/or recommending the "Catamaran Cruise to the Pitons" excursion to the plaintiff and other CARNIVAL passengers; and,

M.      By failing to monitor and/or to react to weather and/or water conditions prior to the excursion in question; and,

N.      By failing to warn the plaintiff and other CARNIVAL excursion participants of treacherous weather and water conditions and other dangers to their safety known to CARNIVAL; and

O.      By failing to warn or advise its excursion passengers that in the past the "Catamaran Cruise to the Pitons" excursion had injured or nearly killed other CARNIVAL passengers; and,

P.      By failing to specify, demand, or enforce an minimum number of qualified guides for the volume of CARNIVAL guests on the "Catamaran Cruise to the Pitons" excursion; and,

Q.      By negligently over-booking the subject excursion; and,

R.      By failing to question defendant COX and/or SAILAWAY and/or SEASPRAY's personnel prior to allowing its passengers to participate in the subject excursion; and,

S.      By failing to establish and/or to follow procedures and protocols to obtain safety information regarding current conditions relevant to the safety of the subject excursion; and,

T.      By failing to familiarize itself with the "highest standards in the industry", or demand that COX and/or SAILAWAY and/or SEASPRAY actually apply that standard of care to the "Catamaran Cruise to the Pitons" excursion; and,

U.      By violating the minimum guide-to-participant ratio and related safety rules, regulations and statutes enacted by the government of St. Lucia specifically for the safety and protection of a class of individuals which included the plaintiff (*i.e.,* negligence *per se*); and,

V.      By failing to allocate a sufficient share of the proceeds of the "Catamaran Cruise to the Pitons" to the excursion operator(s) to make it economically feasible for the excursion operator(s) to apply the highest standards applicable in St. Lucia to such excursions, including the aforementioned guide-to- participant ratio; and

W.      By failing to properly instruct/warn the guests of the dangers and risks of the "Catamaran Cruise to the Pitons"; and,

X.  By failing to cancel or limit the excursion based upon conditions, dangers, and hazards known to CARNIVAL on, or prior to, the day in question; and,

Y.  By misrepresenting and/or and mis-communicating and/or failing to communicate material information to the plaintiff and others in Florida and elsewhere concerning the "Catamaran Cruise to the Pitons" excursion and its participants' safety. CARNIVAL also provided to "Catamaran Cruise to the Pitons" participants, both in Florida and aboard the ship, a description of the excursion described as "detailed" which omitted CARNIVAL's knowledge of the hazards involved in the excursion. These misrepresentations occurred in Florida and resulted in detrimental reliance and a change in legal position by the plaintiff in Florida, *e.g.*, he booked the cruise and excursion in Florida: and,

Z.  By failing to train its own shore excursion managers to look for and correct certain failures of performance by COX and/or SAILAWAY and/or SEASPRAY, *e.g.,* failure to adhere to the requisite minimum guide-to-participant ratio; and,

AA.  By failing to follow up with the excursion operators concerning passenger mishaps known to CARNIVAL and by failing to demand that the excursion operators institute corrective action; and,

BB.  By other acts or omissions as yet unknown which may be identified in discovery.

94.     CARNIVAL, in the entire context and circumstances of its conduct alleged in this Count, acted willfully and/or wantonly and/or recklessly, and evinced a conscious disregard of the rights and safety of others, including the plaintiff.

95.     CARNIVAL is also liable for the fault of defendant COX and/or SAILAWAY and/or SEASPRAY alleged in Count I of this complaint because, upon information and belief, COX and/or SAILAWAY and/or SEASPRAY at all relevant times were acting within CARNIVAL's control or right of control, and/or in the alternative, as joint venturers with CARNIVAL (as more fully alleged in Count IV) and/or CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY were otherwise acting at all relevant times with the others' knowledge and acquiescence as the others' actual or apparent agent(s), pursuant to representations by CARNIVAL and/or by COX and/or SAILAWAY and/or SEASPRAY to that effect, which were relied upon by the plaintiff in booking the subject excursion in Florida and later participating in it.

96.     Further in the alternative, CARNIVAL is also liable for the fault of COX and/or SAILAWAY and/or SEASPRAY alleged in Count I of this Complaint because at all relevant times CARNIVAL occupied the status of COX's and/or SAILAWAY's and/or SEASPRAY's undisclosed principal in COX's and/or SAILAWAY's and/or SEASPRAY's entire activities concerning the "Catamaran Cruise to the Pitons" excursion.

97.     As a direct and proximate result of the negligence and/or willful and/or wanton and/or reckless conduct and/or conscious disregard referred to in this Count, the plaintiff was injured and has suffered, and will suffer, the elements of damage set forth in Paragraph 68 of this complaint.

WHEREFORE, the plaintiff respectfully prays for all legally allowable compensatory and punitive damages, costs, and interest (including pre-judgment interest) against the defendant CARNIVAL, and demands trial by jury as to all matters triable as of right by a jury; or, in the alternative, plaintiff respectfully requests the court to order a jury trial pursuant to *Rule 39(c) Fed. Rules Civ. Pro.*, as to all matters not triable as of right by a jury.

### COUNT III– LIABILITY OF CARNIVAL AND COX AND/OR SAILAWAY AND/OR SEASPRAY FOR INTENTIONAL MISREPRESENTATION

98.     The plaintiff realleges and incorporates paragraphs, 1-97, *supra,* and 107-130, *infra*, as if expressly set forth herein; and further alleges,

99.     Defendants COX and/or SAILAWAY and/or SEASPRAY and CARNIVAL, at all relevant times, acting in and/or from Florida (either in person and/or through agents), deliberately misrepresented to plaintiff the following material information:

A.  A so-called "detailed" description of the excursion which failed to include specific, actual knowledge possessed by the defendants of the hazards involved and/or of prior similar incidents where passengers participating in the "Catamaran Cruise to the Pitons" excursion and similar excursions by others were injured and/or nearly injured and/or nearly killed; and

B.  A so-called "detailed" description of the excursion which failed to include specific, actual knowledge possessed by the defendants that inadequate and/or incompetent guides were habitually being provided for the subject excursion; and,

C.  That the relevant excursion operator(s) were "reputable," and

    D.  That CARNIVAL was functioning as COX's and/or SAILAWAY's and/or SEASPRAY's agent concerning material aspects of its relationship and course of dealing with COX and/or SAILAWAY and/or SEASPRAY; and,

    E.  That CARNIVAL was functioning as the agent of its passengers in arranging for shore excursions; and,

    F.  (By CARNIVAL to its passengers in its cruise ticket) that its passengers can and must bring "*all disputes and matters arising under, or in connection with or incident to this Contract or the Guest's cruise*, including travel to and from the vessel," in a federal court in Florida, as opposed to a court in the St. Lucia. (Which, read literally, would include "all disputes and matters" "incident" to the subject excursion, including "disputes" against COX and/or SAILAWAY and/or SEASPRAY).

100.   All of these representations were false.

101.   These misrepresentations were made and/or repeated in Florida to the Plaintiff by the defendants with knowledge of their substance and falsity.

102.   Alternatively, these misrepresentations were made by the defendants without knowledge as to truth or falsity and/or under circumstances in which the defendants ought to have known, if they did not know, of the falsity thereof.

103.   These misrepresentations were made by the defendants with every intention by the defendants that the plaintiff act upon the misrepresentations.

104.   The plaintiff, while in Florida, detrimentally relied and acted upon the misrepresentations and changed legal positions in Florida, where he booked both his cruise and the subject excursion.

105.    As a direct and proximate result of these misrepresentations by defendants and the plaintiff's detrimental reliance and legal change of position, all of which occurred in Florida, the plaintiff suffered the damages set forth in paragraph 68 of this complaint.

WHEREFORE, the plaintiff respectfully prays for all legally allowable compensatory and punitive damages, costs, and interest (including pre-judgment interest) against the defendants CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, jointly and severally, and demands trial by jury as to all matters triable as of right by a jury or, in the alternative, plaintiff respectfully requests the court to order a jury trial pursuant to *Rule 39(c) Fed. Rules Civ. Pro*., as to all matters not triable as of right by a jury.


## COUNT IV– JOINT VENTURE LIABILITY OF CARNIVAL AND COX AND/OR SAILAWAY AND/OR SEASPRAY

106.    The plaintiff realleges and incorporates paragraphs 1-105 of this complaint as if expressly set forth herein.

107.    Defendants CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, by agreement and/or mutually-accepted understanding and/or by their regular way of doing business together, intentionally conducted and controlled the subject excursion, and its associated business activities, as joint venturers in fact, as follows:

A.    They shared a community of interest in a common purpose and a proprietary interest in the subject matter; and

B.    They jointly shared control and/or each had a right of control; and,

C.    They both had a right to share in the profits; and

D.    They both had a duty to share in the losses that may be sustained.

31

108.   The "subject matter" of the venture, in which CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY shared a joint proprietary interest, included the tickets sold to CARNIVAL passengers for the "Catamaran Cruise to the Pitons" excursion.

109.   CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, by agreement, had joint ownership of the entire excursion ticket, and/or of the consideration paid by CARNIVAL's passengers for the subject excursion; and CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY were mutually bound to the obligations to CARNIVAL's passengers created by the sale of such excursion tickets in Florida and elsewhere.

110.   CARNIVAL and/or COX and/or SAILAWAY and/or SEASPRAY contributed and combined their money, property, time, and skill to make this entire common venture happen.   Additionally, both CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY exerted control over certain operational aspects of the venture, and over each other.

111.   The tickets for the "Catamaran Cruise to the Pitons" excursion were designed and drafted in Florida by CARNIVAL, which placed its logo on the tickets (with the knowledge and acquiescence of COX and/or SAILAWAY and/or SEASPRAY).

112.   The tickets for the subject excursion were "all-inclusive," covering for a single price every single aspect of the subject excursion, including the gross price, round-trip water transportation between Florida and St. Lucia, ground transportation between the ship and the dock (arranged and/or provided by CARNIVAL on behalf of itself and its co-venturer), and water transportation between the dock and the Pitons, and all guides and equipment (arranged for and/or provided by COX and/or SAILAWAY and/or SEASPRAY on CARNIVAL's behalf).

113. This entire, all-inclusive excursion package put together by CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY was offered for sale to CARNIVAL passengers at a large mark-up by CARNIVAL, resulting in a total ticket price far exceeding what a passenger would have to pay ashore for a comparable excursion.

114. CARNIVAL allowed its booked passengers to charge excursion tickets to their passenger charge accounts with CARNIVAL in Florida, for goods and services to be delivered to cruise passengers aboard the subject vessel during the subject cruise.

115. CARNIVAL supplied the enterprise with its U.S. customer base, its Florida-based vessels (to physical transport the customer base from Florida to St. Lucia), and the services of CARNIVAL's Florida lawyers, accountants, website, and sales staff, all to the mutual benefit of CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY.

116. CARNIVAL, in and from Florida, handled all of the marketing, advertising, sales, and revenue management for the subject excursion, as it related to CARNIVAL's U.S. customer base (20% residing in Florida).

117. COX and/or SAILAWAY and/or SEASPRAY wrote and supplied to CARNIVAL a "detailed" description of the excursion which CARNIVAL placed in marketing media and passed along to its actual and prospective passengers.

118. CARNIVAL, on its Miami website and in its sales presentations to the passengers, habitually referred to the excursions as "ours" (meaning CARNIVAL's) or words to that effect, with knowledge and approval of COX and/or SAILAWAY and/or SEASPRAY.

119. COX and/or SAILAWAY and/or SEASPRAY contributed the subject catamaran, crew, and local knowledge.

120. CARNIVAL sent its own employees, *e.g*., shore excursion managers, photographers and videographers to carry out official business of CARNIVAL on the excursions; and agreed to hold its vessels in port, and to interrupt or delay their voyages, if CARNIVAL passengers participating in the "Catamaran Cruise to the Pitons" excursion were late returning to the ship.

121. CARNIVAL imposed strict quality control standards upon COX and/or SAILAWAY and/or SEASPRAY.

122. CARNIVAL agreed with COX and/or SAILAWAY and/or SEASPRAY that CARNIVAL would refrain from selling competing excursions to CARNIVAL passengers.

123. COX and/or SAILAWAY and/or SEASPRAY agreed to refrain from dealing directly with CARNIVAL passengers ashore, so that they effectively agreed to, and at all material times observed, a mutual "non-compete" arrangement concerning the subject excursion.

124. CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY thought of themselves as partners or co-venturers in reference to the subject excursion, as it related to CARNIVAL's customer base, and agreed to split the proceeds roughly evenly.

125. CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY would all benefit financially in proportion to CARNIVAL success (in and from Florida) in selling tickets to the "Catamaran Cruise to the Pitons" excursion (and the other excursion covered by the relevant operating agreement).

126. In the event that CARNIVAL was unsuccessful in its efforts to market and sell the excursion to CARNIVAL mostly-U.S. passengers, however, CARNIVAL and COX and/or

SAILAWAY and/or SEASPRAY would share in those losses, in proportion to their agreed-upon shares of any prospective ticket sales.

127.   CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, also agreed in writing that each would share the losses, if any, from Florida litigation arising from the subject excursion (CARNIVAL has a Florida forum clause in its cruise tickets.).

128.   COX and/or SAILAWAY and/or SEASPRAY agreed to procure U.S. insurance (in Florida) for themselves and their co-venturer, CARNIVAL - to cover both CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY against Florida lawsuits arising from the subject excursion.

129.   CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, were thus engaged in a classic joint venture concerning the subject shore excursion.

130.   All defendants were at all relevant times acting on behalf of the venture and within the scope of its business.

131.   As such, CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY each were and are responsible for the fault of the others, as alleged more specifically in Counts I, II, and III, and for the plaintiff's injuries and damages alleged in paragraph 68 of this complaint.

WHEREFORE, the plaintiff respectfully prays for all legally allowable compensatory and punitive damages, costs, and interest (including prejudgment interest) against the defendants CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, jointly and severally, and demands trial by jury as to all matters triable as of right by a jury; or, in the alternative, plaintiff respectfully requests the court to order a jury trial pursuant to *Rule 39(c) Fed. Rules Civ. Pro*., as to all matters not triable as of right by a jury.

## COUNT V – LIABILITY OF COX AND/OR SAILAWAY AND/OR SEASPRAY AS AN INDEMNITOR(S) OF CARNIVAL

132.   The plaintiff realleges and incorporates paragraphs 1-105 as if expressly set forth herein; and further alleges,

133.   This court in Florida is the only place on earth CARNIVAL allows an injured passenger like plaintiff to bring a cruise excursion-related claim. (CARNIVAL has an exclusive Southern District of Florida forum clause in its cruise ticket).

134.   COX and/or SAILAWAY and/or SEASPRAY, at all relevant times, and upon information and belief, agreed in writing with CARNIVAL to "indemnify, save, protect and defend" CARNIVAL in Florida against liability, and all "causes of action" and "damages" (which ultimately belong to the injured passengers).

135.   Such indemnity and defense language is believed to be contained in a written operating agreement between CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY. The plaintiff does not possess this operating agreement, which will be requested in discovery.

136.   COX and/or SAILAWAY and/or SEASPRAY, at all relevant times and upon information and belief, agreed with CARNIVAL to perform these contractual obligations in a Florida court, and to be subject to Florida and/or U.S. maritime law in such performance.

137.   COX and/or SAILAWAY and/or SEASPRAY, upon information and belief, began performance of their defense and indemnity obligations in Florida by undertaking to defend and indemnify CARNIVAL against the present Florida lawsuit, even prior to service of the complaint upon COX and/or SAILAWAY and/or SEASPRAY as co-defendants.

138.   COX's and/or SAILAWAY's and/or SEASPRAY's undertaking to defend and indemnify CARNIVAL in Florida represents a "business venture" in Florida by

36

COX/SAILAWAY/SEASPRAY for "pecuniary gain," *i.e.,* to secure CARNIVAL's lucrative shore excursion business.

139.   The plaintiff, under both state and maritime common law, is an intended third party beneficiary of these indemnity obligations assumed by COX and/or SAILAWAY and/or SEASPRAY.

WHEREFORE, the plaintiff respectfully prays for all legally allowable compensatory and punitive damages, costs, and interest (including prejudgment interest) against the defendants CARNIVAL and COX and/or SAILAWAY and/or SEASPRAY, jointly and severally, and demands trial by jury as to all matters triable as of right by a jury or, in the alternative, plaintiff respectfully requests the court to order a jury trial pursuant to *Rule 39(c) Fed. Rules Civ. Pro.*, as to all matters not triable as of right by a jury.

Dated:  January 27, 2012
                West Palm Beach, Florida

                                                    Respectfully submitted,

                                                    ERIKSEN LAW FIRM
                                                    2161 Palm Beach Lakes Boulevard
                                                    Suite 410
                                                    West Palm Beach, FL 33409-6611
                                                    Tel:    866-493-9902 (Toll-free)
                                                            Fax:    561-533-8715
                                                    mde@travelaw.com

                                                    By: /s/  Michael D. Eriksen
                                                            MICHAEL D. ERIKSEN
                                                            Florida Bar No. 316016